# SYLVESTER E. HARPER *v.* AMARYLLIS M. HARPER

[No. 92, September Term, 1981.]

*Decided July 23, 1982.*

The cause was argued before SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ., and J. DUDLEY DIGGES, Associate Judge of the Court of Appeals (retired), specially assigned.

*Jeffrey Lee Greenspan* for appellant.

*Steven R. Migdal,* with whom were *Manis, Wilkinson, Snider & Goldsborough, Chartered* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court.

This case presents two questions concerning the characterization and equitable distribution of certain property as marital property under Maryland Code (1974, 1980 Repl. Vol.) § 3-6A-01 (e) of the Courts and Judicial Proceedings

Article. More particularly, it initially presents the question whether real property, purchased under an installment contract and paid for in part before marriage and in part during marriage, is marital property. Additionally, it presents the question whether a marital residence constructed on that real property during marriage is marital property.

The relevant statutory provisions are § 3-6A-01 (e) and § 3-6A-05 (a), (b), and (c).

Section 3-6A-01 (e) provides:

> " 'Marital property' is *all property, however titled, acquired* by either or both spouses *during their marriage. It does not include property acquired prior to the marriage,* property acquired by inheritance *or* gift from a third party, or property excluded by valid agreement or *property directly traceable to any of these sources.*" (Emphasis added.)

Section 3-6A-05 (a) provides in pertinent part:

> "(a) In granting an absolute divorce or annulment . . . *the court shall determine which property is marital property* if the division of property is an issue." (Emphasis added.)

Section 3-6A-05 (b) and (c) provide:

> "(b) *The court shall determine the value of all marital property.* After making the determination, *the court may grant a monetary award as an adjustment of the equities and rights of the parties concerning marital property,* whether or not alimony is awarded. The amount of the award and the method of its payment shall be determined *after considering* each of the following factors:
>
> "(1) *The contributions, monetary and non-monetary, of each party to the well-being of the family;*

"(2) *The value of all property interests of each spouse;*

"(3) The economic circumstances of each spouse at the time the award is to be made;

"(4) The circumstances and facts which contributed to the estrangement of the parties;

"(5) The duration of the marriage;

"(6) The age and the physical and mental condition of the parties;

"(7) *How and when specific marital property was acquired, including the effort expended by each party in accumulating the marital property;*

"(8) Any award or other provision which the court has made under this Subtitle 6A with respect to family use personal property or the family home, and any award of alimony; and

"(9) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award.

"(c) A monetary award made under this section may be reduced to a judgment to the extent that any part of the award is due and owing." (Emphasis added.)

In 1950 the petitioner, Sylvester E. Harper (husband), then unmarried, purchased an unimproved parcel of real property for a purchase price of approximately $355.00. The purchase was made under a land installment contract requiring a monthly payment of approximately $6.90. Before his marriage, the husband made all of the payments that came due.

On 3 November 1951, the husband married the respondent, Amaryllis M. Harper (wife). During the marriage, the husband continued to make all of the payments that came due until all of the requisite payments had been made.

In 1967 the husband personally built a house, costing

approximately $21,600.00, upon the real property. That house was used by the parties as their marital residence. Although the wife's name appeared on the mortgage and she was legally obligated under it, the husband made all of the mortgage payments that came due on the marital residence. Additionally, the husband paid for all of the expenses associated with the upkeep and repair of the marital residence.

According to the wife, a substantial part of the payment on a previous house jointly owned by the parties was provided by her mother, and the proceeds of the sale of that house were used to finance the construction of the marital residence built in 1967. According to the husband's pleadings, he made all of the payments for the land, construction of the marital residence, and its upkeep. At all times, the property was titled solely in the husband's name.

On 14 March 1980, in the Circuit Court for Anne Arundel County, the wife filed a bill of complaint for an absolute divorce. She requested, among other things, "that the Court determine the ownership of all the real property regardless of how titled, and order the sale of said real property, and divide the proceeds equitably."

At trial, there was evidence to show that there was an outstanding mortgage indebtedness of approximately $8,300.00 on the marital residence which was then appraised at a fair market value of approximately $65,500.00. There was no evidence to show the precise source and extent of the funds utilized during the marriage for payments for the land, construction of the marital residence, and its upkeep.

On 10 November 1980, a decree was entered granting the wife, among other things, an absolute divorce and a division of real property. More particularly, the trial court declared that the real property consisting of the lot with the marital residence upon it was marital property and ordered a sale in lieu of partition with each party receiving one-half of the proceeds of the sale. In reaching this result, the trial court said:

"In making a determination of ownership of real

property under the applicable statutes upon granting a decree of divorce, the Court is guided by several factors including the contributions, both monetary and nonmonetary, made by each party to the well-being of the family; the value of the property interests of each spouse; the circumstances contributing to the estrangement of the parties; the duration of the marriage; the age and physical condition of the parties; and how and when the specific marital property was acquired. In this case, it is true that the Respondent provided the bulk of financial contributions toward acquiring the real property in question, however, the Complainant, as a wife and mother of some twenty-nine (29) years, made substantial nonmonetary contributions toward the marriage and the family during the time the said real property was acquired. Furthermore, this Court notes that the estrangement of the parties stemmed from the Respondent's cruel and abusive conduct toward the Complainant resulting in a divorce a mensa for constructive desertion. The length of the marriage in this case is considerable, spanning twenty-nine years of the parties' lives. The Court has also weighed the other factors mentioned above and concludes that the real property in question is marital property in which each spouse is entitled to a one-half share. For this reason the Court shall order a sale in lieu of partition of the said real property with an equitable distribution of the proceeds as prayed for by the Complainant."

The husband appealed to the Court of Special Appeals. *Harper v. Harper,* 49 Md. App. 339, 431 A.2d 761 (1981). In determining that the real property and marital residence were marital property, the Court of Special Appeals said:

"The thrust of appellant's argument on this issue is that since he acquired the lot, upon which the house was built, before the marriage, and since the house constituted a permanent improvement

thereto, both the house and lot do not meet the statutory definition of marital property and thus the chancellor erred in concluding that this property was marital property. We disagree.

"With respect to the lot, while Mr. Harper had equitable title thereto prior to the marriage, see *Kinsey v. Drury,* 146 Md. 227, 126 A. 125 (1924), *Kingsley v. Makay,* 253 Md. 24, 251 A.2d 585 (1969), it is clear that he acquired legal title after the marriage. It would appear, in fact, that since the marriage took place within a year of his execution of the land installment contract, the bulk of payment thereon took place after the marriage. In our view the lot was acquired during the marriage within the meaning of Cts. Art. Sec. 3-6A-01.[3]

"With respect to the house built on the lot, after the parties had been married some sixteen years, it constituted a permanent improvement upon the lot; in fact, title in Mr. Harper's name was never changed although the parties talked about making that change. Having concluded the chancellor was correct in finding the lot to be marital property, it necessarily follows that the house erected thereon after the marriage of the parties would likewise, under the facts present here, be marital property. Indeed, not to conclude thusly would frustrate the very purpose of the marital property distribution act. . . ." *Harper,* 49 Md.App. at 345-46, 431 A.2d at 764.

In footnote 3, the Court of Special Appeals said:

"**3.** *See* State Roads Commission v. Orleans, 239 Md. 368, 376-377, 211 A.2d 715 (1965), in which the Court of Appeals, in a condemnation case, held that the word 'acquire' means to become an owner of real property by obtaining legal title, rather than mere possession.

"*See also,* Levi, The Tax Consequences of the Maryland Marital Property Act, 9 U. Balt. L. Rev.

12, 15-16 n.17 (1979), discussing the argument that real property owned by a spouse prior to marriage but subject to a mortgage, may be deemed marital property if the mortgage is paid off with marital property funds." *Harper*, 49 Md.App. at 345, 431 A.2d at 764.

Thus, the Court of Special Appeals found, for reasons different from those expressed by the trial court, that the real property and the marital residence upon it constituted marital property. That Court additionally found that the trial court erred in ordering sale in lieu of partition.[1] Accordingly, the Court of Special Appeals vacated the trial court's judgment "only insofar as it provides for sale in lieu of partition and for distribution. . . ."[2] That Court directed that "[u]pon remand the chancellor should follow the guidelines provided in Sec. 3-6A-05 (b) of the Courts Article." In all other respects, the Court of Special Appeals affirmed the trial court's judgment.

The husband filed a petition for a writ of certiorari that we granted. We shall reverse in part the judgment of the Court of Special Appeals.

Maryland's Property Disposition in Divorce and Annulment Act (Act), Md. Code (1974, 1980 Repl.Vol. & 1981 Cum.Supp.) §§ 3-6A-01 through 3-6A-07 of the Courts and Judicial Proceedings Article represents "a new legislative approach to the concept of marriage." *Deering v.*

---

1. Section 3-6A-04 provides:

"(a) When granting an absolute divorce or annulment, the court may resolve any dispute between the spouses with respect to the ownership of real property. However, the court may not transfer the ownership of real property from one spouse to the other.

"(b) In accordance with the court's determination of the ownership of real property, the court may:

"(1) Grant a decree which states what the ownership interest of each spouse is; and

"(2) As to any jointly owned property, order a partition or sale in lieu of partition and a division of the proceeds."

2. The question of the validity of the trial court's order of partition and distribution has not been raised in this Court and, therefore, is not considered here.

*Deering,* 292 Md. 115, 122, 437 A.2d 883, 887 (1981). The Act was proposed by The Governor's Commission on Domestic Relations Laws which stated in its report to the Governor:

> "*The Commission does not believe that the people of Maryland today hold the view that a spouse whose activities within the marriage do not include the production of income has 'never contributed anything toward the purchase of' property acquired by either or both spouses during the marriage.* Its members believe that non-monetary contributions within a marriage are real and should be recognized in the event that the marriage is dissolved or annulled. As homemaker and parent and housewife and handyman (of either sex), as a man and a woman having equal rights under the law united into one family unit, in which each owes a duty to contribute his or her best efforts to the marriage, the undertakings of each are for the benefit of the family unit. In most cases, each spouse makes a contribution entitled to recognition, even though the standards or methods of quantifying a spouse's non-monetary contribution are inexact." Report of The Governor's Comm'n on Domestic Relations Laws, at 3 (1978) (emphasis added).

The Commission recognized that the marital residence is ordinarily the major asset of a marriage when it said:

> "Experience shows that in the great majority of cases where property of any significance is involved, it consists of the family home, its contents, and one or more automobiles. It is an unusual case in which other investments of consequence are involved. A divorce law should be utilitarian — it should do the most good for the most people. Consequently, it is mainly the needs of the average person that must be addressed and satisfied." Report of The Governor's Comm'n on Domestic Relations Laws, at 4 (1978).

Thus, the Commission expressly indicated that one of the remedial purposes of the proposed Act was to protect the interests of spouses who had made nonmonetary contributions to the marital residence. The proposed Act was designed to achieve this remedial purpose by "end[ing] the inequity inherent in Maryland's old 'title' system of dealing with the marital property of divorcing spouses." Report of The Governor's Comm'n on Domestic Relations Laws, at 1 (1982). The proposed Act established "the concept of 'marital property' as being all that property which was acquired by the parties during their marriage" and gave the court the power to "recognize non-monetary as well as monetary contributions of the parties to the marriage" in determining the value of and making an equitable distribution of the marital property. Report of The Governor's Comm'n on Domestic Relations Laws, at 5 (1978).

The General Assembly's basic adoption of the Commission's approach is evidenced by the preamble to the Act that states:

"The General Assembly declares that it is the policy of this State that marriage is a union between a man and a woman having equal rights under the law. Both spouses owe a duty to contribute his or her best efforts to the marriage, and both, by entering into the marriage, undertake to benefit both spouses and any children they may have.

"The General Assembly declares further that *it is the policy of this State that when a marriage is dissolved the property interests of the spouses should be adjusted fairly and equitably, with careful consideration being given to both monetary and nonmonetary contributions made by the respective spouses* to the well-being of the family, and further, that if there are minor children in the family their interests must be given particular and favorable attention." 1978 Md.Laws, ch. 794 at 2305 (preamble) (emphasis added).

Similarly, this Court has recognized that it is "this State's policy to adjust the property interests of spouses fairly and equitably upon the dissolution of their marriage and to give careful consideration to both monetary and nonmonetary contributions by the spouses to the well-being of the family." *Bender v. Bender,* 282 Md. 525, 535 n.7, 386 A.2d 772, 778 n.7 (1978).

Because of its broad remedial purpose, including the protection of the interests of spouses making nonmonetary contributions to the marital residence, this Act should be liberally construed. *Keesling v. State,* 288 Md. 579, 589, 420 A.2d 261, 266 (1980); *James v. Prince George's County,* 288 Md. 315, 335, 418 A.2d 1173, 1184 (1980); 3 Sutherland, *Statutory Construction* § 60.01-02 (4th ed. C.Sands 1974). This Court has previously construed the Act broadly in *Deering,* 292 Md. at 128, 437 A.2d at 890. There it held that virtually all types of civilian retirement benefits accrued by a spouse during marriage constitute marital property, and placed the complex task of valuing and allocating retirement benefits between former spouses within the discretion of the trial court. Here we shall construe the Act broadly with respect to whether real property, paid for in part before marriage and in part during marriage, as well as a marital residence constructed upon that real property during marriage, constitute marital property.

Courts in the majority of community property states in which the question has been considered have held that real property paid for in part before marriage and in part during marriage remains the separate property of the spouse who made the payments before marriage. *E.g., Potthoff v. Potthoff,* 128 Ariz. 557, 562-63, 627 P.2d 708, 713-14 (Ct.App. 1981); *Fisher v. Fisher,* 86 Idaho 131, 136, 383 P.2d 840, 842-43 (1963); *Harris v. Harris,* 160 So.2d 359, 360-61, 363 (La.Ct.App. 1964); *Laughlin v. Laughlin,* 49 N.M. 20, 37, 155 P.2d 1010, 1020-21 (1944); *Dakan v. Dakan,* 125 Tex. 305, 320, 83 S.W.2d 620, 628 (1935); *Villarreal v. Villarreal,* 618 S.W.2d 99, 100-01 (Tex.Civ.App. 1981); *Merkel v. Merkel,* 39 Wash.2d 102, 113-14, 234 P.2d 857, 863-64

(1951). The rationale underlying this rule is the inception of title theory.

A classic statement of the inception of title theory, as it applies to real property, appears in *Fisher v. Fisher,* 86 Idaho 131, 383 P.2d 840 (1963). There a husband contracted to purchase real property before marriage. While he made some payments before marriage, the remaining payments were made during marriage from community funds. The Supreme Court of Idaho stated:

> "The status of property as separate or community property *is fixed as of the time when it is acquired. The word 'acquired' contemplates the inception of title, and as a general rule the character of the title depends upon the existence or nonexistence of the marriage at the time of the incipiency of the right by virtue of which the title is finally extended and perfected;* the title when so extended and perfected relates back to that time. Stated in another way, the status of title, as belonging to one estate or the other, is determined by the status of the original right, subsequently matured into full title. *Under this rule, property to which one spouse has acquired an equitable right before marriage is separate property, though such right is not perfected until after marriage."* *Fisher,* 86 Idaho at 135-36, 383 P.2d at 842 (emphasis added).

That Court held that the real property was the separate property of the husband.

Although courts employing the inception of title theory characterize property paid for partly before marriage as separate property, they nonetheless hold that the community is entitled to some degree of compensation for community funds contributed to the separate property in the form of mortgage payments. *E.g., Potthoff,* 128 Ariz. at 562-63, 627 P.2d at 713-14; *Fisher,* 86 Idaho at 134, 383 P.2d at 842-43; *Harris,* 160 So.2d at 360-61, 363; *Laughlin,* 49 N.M. at 37, 155 P.2d at 1020-21; *Dakan,* 125 Tex. at 320, 83

S.W.2d at 628; *Villarreal,* 618 S.W.2d at 101; *Merkel,* 39 Wash.2d at 113-14, 234 P.2d at 863-64. Some of these courts have held that the community has an "equitable lien" for the amount of any mortgage payments made from community funds. *E.g., Potthoff,* 128 Ariz. at 562-63, 627 P.2d at 713-14; *Gapsch v. Gapsch,* 76 Idaho 44, 53, 277 P.2d 278, 283 (1954); *Laughlin,* 49 N.M. at 36, 155 P.2d at 1020; *Merkel,* 39 Wash.2d at 113-14, 234 P.2d at 863-64; *In re Marriage of Harshman,* 18 Wash.App. 116, 123, 567 P.2d 667, 671-72 (1977). Others have held that the community has "a right to reimbursement" for the amount of any mortgage payments made from community funds. *E.g., Moore v. Moore,* 255 So.2d 193, 195-97 (La.Ct.App. 1971); *Dakan,* 125 Tex. at 320, 83 S.W.2d at 628; *Villarreal,* 618 S.W.2d at 101. Courts in such jurisdictions have held that increases in the value of a spouse's separate property, attributable solely to the normal appreciation of such property, remain a part of the separate property and require no reimbursement to the community. *E.g., Succession of Hotard,* 248 So.2d 30, 33 (La.Ct.App. 1971); *Laughlin,* 49 N.M. at 36, 155 P.2d at 1020.

Similarly, courts in a majority of community property states employing the inception of title theory have held that improvements made on the separate real property of a spouse during marriage are the separate property of that spouse, even though the improvements were provided by the expenditure of community funds or efforts. A classic statement of the inception of title theory as it applies to improvements to real property appears in *Brown v. Brown,* 58 Ariz. 333, 119 P.2d 938 (1941). There, a wife owned unimproved real property before marriage. During the marriage, the husband constructed a house upon that real property. The Supreme Court of Arizona stated:

> "The rule of law governing such a situation, as announced by this court, is found in Ammerman v. Crozier, 37 Ariz. 181, 291 P. 995, wherein we said, quoting from 31 Corpus Juris 34, section 1123: 'As a general rule, *when the separate funds of the other spouse or the community funds are expended in*

*improvements on the separate property of one of the spouses, the title to the improvements follows the land,* in the absence of any specific agreement to the contrary. . . .' Under this rule, the lots being the separate property of the plaintiff, the improvements put thereon became a part of the realty and also the separate property of the plaintiff." *Brown,* 58 Ariz. at 337-38, 119 P.2d at 940 (emphasis added).

Although courts employing the inception of title theory characterize improvements made on a spouse's separate property during marriage as separate property, they nonetheless hold that the community is entitled to some degree of compensation for improvements made on the separate property by the expenditure of community funds or efforts. Some of these courts have held that the community is entitled to compensation in the amount of the enhanced value of a spouse's separate property attributable to improvements provided by community funds or efforts. *E.g., Lawson v. Ridgeway,* 72 Ariz. 253, 261, 233 P.2d 459, 464-65 (1951); *Tilton v. Tilton,* 85 Idaho 245, 249-50, 378 P.2d 191, 193-94 (1963); *Abunza v. Olivier,* 230 La. 445, 458, 88 So.2d 815, 820 (1956); *Deliberto v. Deliberto,* 400 So.2d 1096, 1100 n.5 (La.Ct.App. 1981); *Lindsay v. Clayman,* 151 Tex. 593, 600, 254 S.W.2d 777, 781 (1952); *Villarreal,* 618 S.W.2d at 101. In cases in which the increase in value of separate property is attributable to the normal appreciation of such property, as well as to the expenditure of community funds and efforts, the community is entitled to compensation only for that portion of the increase attributable to community funds and efforts.[3] *E.g., Potthoff,* 128 Ariz. at 564-65, 627 P.2d at 715-16; *Gapsch,* 76 Idaho at 52, 277 P.2d at 282; *Michelson v. Michelson,* 89 N.M. 282, 288, 551 P.2d 638, 644 (1976); *McCoy v. Ware,* 25 Wash.App. 648, 650, 608 P.2d 1268, 1269 (1980).

---

3. In Louisiana, the community is entitled to the entire increase in value of separate property when such increase is attributable to the normal appreciation of the property as well as to the expenditure of community funds and efforts. *Deliberto,* 400 So.2d at 1101.

In sum, community property states employing the inception of title theory characterize property paid for partly before marriage, as well as improvements made on that property during marriage, as the separate property of the spouse who made the payments before marriage. The community is entitled to compensation, whether denominated as an "equitable lien" or a "right to reimbursement," in the amount of community funds expended for mortgage payments. In addition, the community is entitled to compensation in the amount of the enhanced value of the separate property attributable to the improvements provided by community funds or efforts. The community is not entitled to compensation for the amount of an increase in value of the separate property that is attributable solely to normal appreciation. In cases in which an increase in value of the separate property is attributable to the normal appreciation of such property, as well as to the expenditure of community funds and efforts, the community is entitled to compensation only for that portion of the increase attributable to community funds and efforts.

Courts in at least one equitable distribution state have employed the inception of title theory. In *Cain v. Cain,* 536 S.W.2d 866 (Mo.Ct.App. 1976), a husband purchased a farm paid for in part before marriage and in part during marriage from marital funds. The farm increased in value during the marriage. The Missouri Court of Appeals, employing the inception of title theory, held that the farm and its increase in value were the husband's separate property and, therefore, nonmarital. The Court did not impose a lien or charge on the property in favor of the wife. However, it indicated that payments made during marriage from marital funds and the increase in the value of the farm were relevant factors to be considered when dividing the marital property. Essentially the same result was reached in subsequent cases in which real property paid for in part before marriage and in part during marriage had been improved during marriage by the expenditure of community funds and efforts. *E.g., Null v. Null,* 608 S.W.2d 568, 570 (Mo.Ct.App. 1980); *Stark v. Stark,* 539 S.W.2d 779, 783 (Mo.Ct.App. 1976).

Courts in at least one community property state, California, have rejected the inception of title theory. In California, when real property is paid for in part before marriage from a spouse's separate funds and in part during marriage from community funds, and improvements are placed on the real property during marriage, such property and its improvements are characterized as part separate and part community. Under the California rule, the spouse contributing separate funds is entitled to a "pro tanto community property interest" in such property and improvements in the ratio of the separate investment to the total separate and community investment in the property. Similarly, the community is entitled to a "pro tanto community property" interest in such property and improvements in the ratio of the community investment to the total separate and community investment in the property.[4] *E.g., Moore v. Moore,* 28 Cal.3d 366, 371-72, 618 P.2d 208, 210, 168 Cal.Rptr. 662, 664 (1980); *In re Neilson's Estate,* 57 Cal.2d 733, 744, 371 P.2d 745, 751, 22 Cal.Rptr. 1, 7 (1962); *Bare v. Bare,* 256 Cal.App. 2d 684, 689-90, 64 Cal.Rptr. 335, 338-39 (1967); *Forbes v. Forbes,* 118 Cal.App.2d 324, 325, 257 P.2d 721, 722 (1953).

As a result of the application of the California rule, both the spouse who contributed separate funds and the community that contributed community funds each receive a proportionate and fair return on their investment. Contrary to the rule adopted in most community property states, the California rule does not limit the community to compensation for a share of the enhanced value of the property attributable to the expenditure of community funds and efforts, but rather entitles the community additionally to

---

[4] On occasion, some courts in other community property states have utilized language indicating a similar rejection of the inception of title theory. *E.g.,* Barrett v. Franke, 46 Nev. 170, 175, 208 P. 435, 437 (1922) (community property to the extent and in the proportion that the purchase price is contributed by the community); Guye v. Guye, 63 Wash. 340, 352, 115 P. 731, 735 (1911) (community property to the extent and in the proportion that the consideration is furnished by the community); W.de Funiak & M. Vaughn, *Principles of Community Property,* 133-34 (2d ed. 1971).

share in the increased value attributable to the normal appreciation of the property.

The rationale underlying California's "pro tanto community property interest" rule is the source of funds theory. That theory is premised on the concept that it is unfair to permit a spouse who has contributed separate funds to the purchase or improvement of property to enjoy all of the benefits of sole ownership of the property without regard to the fact that it had been purchased or improved in part with community funds.

As long ago as 1926, the source of funds theory was expressed in *Vieux v. Vieux,* 80 Cal.App. 222, 251 P. 640 (1926). There a husband contracted to purchase certain property before marriage. The property was paid for in part before marriage from the husband's separate funds and in part during marriage from an admixture of the husband's separate funds and community funds. The District Court of Appeal initially pointed out that from the circumstances surrounding the purchase of the property and the fact that during the marriage community funds were used in payment of the purchase price, an inference could be drawn that the husband and wife had agreed that the property was community rather than separate. The Court found that a relationship "somewhat in the nature of a partnership . . . existed between the parties — the husband on the one side, and the community consisting of the husband and the wife, on the other side." The Court then said:

> "For purposes affecting strangers, the acquisition, through an installment contract, of the right to purchase real property, may be considered as ownership of such property, in that such holding may entitle the intending purchaser to the possession and the use of the property to the exclusion of others; but, as between husband and wife, where community funds are used to a considerable extent in the payment of the purchase price, the meaning of the statute relating to the definition of separate and community property of spouses cannot be so

limited. The confidential relationship existing between husband and wife forbids such a strict construction to be placed upon the statute as will destroy the probable intent of the husband and wife with reference to the manner in which the ownership of the property is enjoyed. Any other construction in these days of liberal terms, with reference to installment purchase price contracts for the sale of real property, including the possible provision of 'a dollar down and a dollar per week,' would permit a husband or a prospective husband, to buy or to agree to buy any reasonable quantity of lots or lands on the payment by him from his separate funds of a comparatively insignificant sum and thereafter to pay practically the entire purchase price from the community funds, and yet successfully maintain that, because in its inception the naked right to purchase, carrying with it the right of use and possession, was his separate property, it so remained. It would seem improbable that, through general definitions of terms, the intention of the lawmakers was to bring about a result which, in many if not a majority of instances, would be of so disastrous and unjust a consequence. Rather should it be assumed that, when the Legislature undertook to define separate property as that owned by the husband before marriage, even though in other statutes the right of exclusive possession and use was specified as the indicia of ownership, the 'ownership' in the husband through and by virtue of which the wife's interest would be entirely excluded, would necessarily be an absolute ownership, as distinguished from a limited ownership, and that, so far as community funds might participate in the acquisition or protection of vested rights, to that extent proportionally should the property be considered as 'community.'

. . .

*[J]ustice demands that the rights of the parties*

> *should be measured by the direct contributions made by the respective parties to the purchase price of the property. . . .* [T]he community interest was entitled to share in the title to the property in the same proportion as the amount contributed to the purchase price by the community . . . bore to . . . the total amount paid by the respective parties therefor." *Vieux,* 80 Cal.App. at 227, 228, 229, 251 P. at 642, 643 (emphasis added).

In at least one equitable distribution state, Maine, a court has rejected the inception of title theory and has employed the source of funds theory. In *Tibbetts v. Tibbetts,* 406 A.2d 70 (Me. 1979), a case involving facts somewhat different from those here, a husband and wife purchased real property as joint tenants during the marriage. The property was paid for by an admixture of community funds and separate funds that the wife had acquired before marriage. The Supreme Judicial Court of Maine, in considering whether the property was marital or nonmarital,[5] said:

> "Such property is non-marital *to the extent* that it was acquired in exchange for property acquired prior to marriage. Thus *a single item of property may be to some extent non-marital and the remainder marital.* Accordingly, where property is acquired in exchange for both marital property and non-marital property, the portion attributable to each must be determined. That portion of the property acquired in exchange for non-marital property must then be 'set apart' as directed by 19 M.R.S.A. § 722-A (1).
>
> . . .
>
> "The divorce court must, therefore, separate

---

5. Me.Rev.Stat.Ann.tit.19, § 722-A (1981) provides in pertinent part:

"2. . . . 'marital property' means all property acquired by either spouse subsequent to the marriage, except:
. . .

"B. Property acquired in exchange for property acquired prior to the marriage. . . ."

marital and non-marital property by tracing from the evidence adduced the contributions each may have made to the acquisition of a particular item.

. . .

"In thus interpreting the process of separating marital and non-marital property which has been conjoined in the acquisition of a single property during marriage, we find guidance in the fundamental purposes underlying the approach to disposition of the spouses' property mandated by 19 M.R.S.A. § 722-A and Section 307 of the Uniform Marriage and Divorce Act as originally promulgated in 1970. This research suggests that our choice is between a static or a dynamic interpretation of the term 'acquisition.' *We adopt a dynamic interpretation in that the proper characterization of property as marital or non-marital may shift as individual items of property, marital or non-marital, are contributed by the spouses* in exchange for the property acquired.

"The approach we choose comports with the general goals of the Uniform Act.

. . .

"The partnership theory, upon which the law of community property and this provision of the Uniform Marriage and Divorce Act is based, requires that the marital estate be entitled to a proportionate share in the value of property where its equity interest was partially acquired by marital funds. *Where the marital estate chooses to invest its funds in certain property together with non-marital funds, the marital estate is entitled to a proportionate return on its investment.*

. . .

"Our interpretation of the term 'acquisition' has led us up and down the American West and even to

the shores of Old Spain. It appears that the courts of our community property states have not with ease adapted to the realities of complex modern transactions and relationships. We conclude that in fairness to both spouses *'acquisition' must not arbitrarily and finally be fixed on the date that a legal obligation to purchase is created. Rather, 'acquisition' should be recognized as the on-going process of making payment for acquired property. Characterization of the property acquired will then depend on the source of each contribution as payments are made."* Tibbetts, 406 A.2d at 75, 76, 77 (emphasis added) (citations omitted) (footnotes omitted).

Courts in other equitable distribution states have, for a variety of reasons, rejected the inception of title theory in cases involving facts closely analogous to those here. *E.g., In re Marriage of Lee,* 87 Ill.2d 64, 66, 430 N.E.2d 1030, 1031 (1981); *In re Marriage of Smith,* 86 Ill.2d 518, 529-32, 427 N.E.2d 1239, 1244-46 (1981). *Cf. Hinchey v. Hinchey,* 625 P.2d 297, 304 (Alaska 1981); *In re Marriage of Altman,* 35 Colo.App. 183, 185, 530 P.2d 1012, 1013 (1974); *Hille v. Hille,* 313 N.W.2d 783, 785-86 (N.D. 1981). These courts, however, have not employed the source of funds theory.

In *In re Marriage of Smith,* 86 Ill.2d 518, 427 N.E.2d 1239 (1981), the Supreme Court of Illinois employed a transmutation of property theory. There, a husband owned improved property acquired in settlement of his mother's estate. During the marriage, additional improvements were made with marital funds. The Supreme Court of Illinois found "from the interplay of sections 503 (a) and (b) as well as the provisions of section 503 (c)(1)" that the Illinois Act [6]

---

**6.** Section 503 of the Marriage and Dissolution Act (Ill.Rev.Stat.ch.40 (1977)) provides in pertinent part:

"(a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':

. . .

indicated a legislative preference for the classification of property as marital. That Court said:

"[S]ection 503 (c)(1) also indicates that preference be given to classifying property as marital. Under this section any contribution made to either marital or nonmarital property may be considered in the division of *marital* property. Therefore, even where the contribution of one partner is insignificant, the possibility of the ultimate property division being inequitable is far less where commingled property is presumed marital rather than nonmarital, since the pool of marital property available for division is greater. Nonmarital property, of course, may still retain its character, despite a contribution of marital funds. We have simply interpreted section 503 as establishing a rebuttable presumption that the contribution is intended to change the character of the property to marital.

. . .

"*We accordingly hold that the preference indicated by the legislature for the classification of property as marital can best be served by presuming that the contributors of marital property to*

---

"(5) the increase in value of property acquired before the marriage; and

"(6) property acquired before the marriage.

"(b) All property acquired by either spouse after the marriage . . . is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership. . . . The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a) of this Section.

"(c) In a proceeding for dissolution of marriage . . . the court shall assign each spouse's non-marital property to that spouse. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:

"(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit. . . ."

*nonmarital property intended that the commingled property be treated as marital.* In other words, the failure of a nonmarital property holder to segregate that property will give rise to the rebuttable presumption that *the nonmarital property has been transmuted,* regardless of the status of title." *In re Marriage of Smith,* 86 Ill.2d at 531-32, 427 N.E.2d at 1245-46 (emphasis added).

In *In re Marriage of Lee,* 87 Ill.2d 64, 430 N.E.2d 1030 (1981), the Supreme Court of Illinois again employed a transmutation of property theory. There, a husband purchased a residence before marriage. During the marriage, the husband made improvements on the residence paid for from marital funds. At all times, the residence, which was the principal asset involved in the case, was titled in the husband's name. The Appellate Court of Illinois, recognizing that "substantial marital property was diverted to the enhancement of the residence," said:

"To interpret the statute to mean that the improvements are non-marital property and deny appellee any share in them despite her contribution would be grossly inequitable and flaunt the purpose for which the statute had been enacted. Rather, we believe that in light of sections 503 (b) and (c) there has been a commingling of marital property and non-marital property which serves to transmute the entire property into marital property.

. . .

"Although this precise issue has not been previously decided by this court we find the rationale of the transmution theory persuasive. In *Klingberg [v. Klingberg,* 68 Ill.App.3d 513, 516-17, 386 N.E.2d 517, 520 (1979)] the court held that where non-marital property is commingled with marital property, this evinces an intent to treat it as marital property. This presumption is particularly apt in the present case. There was clearly commingling of

non-marital property (the residence) and marital property ($12,000 in improvements). The circumstances clearly show an intent to treat the house as marital property. The family lived in the residence and substantial amounts of marital funds were invested in it to improve it. Appellant has presented no evidence to rebut this presumption.

"Treating the residence as marital property will not be inequitable to the appellant, who made a substantial investment of non-marital property in the residence. Under section 503 (c), in dividing marital property the court must take into account the 'contribution *** of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and nonmarital property ***' (Ill.Rev.Stat.1979, ch. 40, par. 503 (c) (1)). In the instant case, to guarantee an equitable distribution the court need simply take into account appellant's contribution.

. . .

In many cases, such as the one at bar, the primary asset of the marriage is the marital residence. To hold that where one spouse owned the residence prior to marriage, the residence is non-marital property of which the other spouse is entitled to nothing despite significant contributions is to guarantee an unequitable distribution of property in contravention of the purpose of the statute. Further, such a reading of the statute would have the anomalous effect of transforming marital property into non-marital property in that marital funds would be used to increase the equity in non-marital property. We do not believe the legislature intended to create such a loophole from which manifestly inequitable results could frequently occur.

"Instead, we hold that *where there has been a contribution of marital property to non-marital property, the entire property is transmuted to mari-*

*tal property. This will guarantee that the contribution of each spouse will be considered in dividing the property* and insure an equitable distribution." *Lee v. Lee,* 88 Ill.App.3d 1044, 1046-47, 410 N.E.2d 1183, 1185 (1980) (emphasis added).

The Supreme Court of Illinois affirmed the judgment of the Appellate Court of Illinois. *In re Marriage of Lee,* 87 Ill.2d 64, 430 N.E.2d 1030 (1981). The Supreme Court of Illinois held that the husband's nonmarital property was transmuted into marital property and, therefore, that the marital residence constituted marital property. It further held that the value of the marital residence was subject to equitable distribution and that the husband's nonmarital contribution to the residence was a factor to be considered in determining an equitable distribution of all the marital property.

We must now determine the appropriate analysis to be used in construing the Maryland Act. We note that in *Deering v. Deering,* 292 Md. 115, 437 A.2d 883 (1981), this Court, recognizing the differences between the statutes of community property states and equitable distribution states, said:

> "Although Maryland's statute, providing solely for an equitable, monetary adjustment of marital property rights between former spouses, neither requires equal partitioning of marital property nor authorizes a court to change title to such property, the rationale of decisions from community property jurisdictions has proven useful. . . ." *Deering,* 292 Md. at 123 n.6, 437 A.2d at 887-88 n.6.

However, the language of § 3-6A-01 (e) of the Courts and Judicial Proceedings Article that " 'marital property' is all property, however titled," expressly establishes that a determination of what constitutes marital property under § 3-6A-05 (a) is not dependent upon the legalistic concept of title. We reject the inception of title theory employed by a majority of community property states and at least one equi-

table distribution state. Accordingly, under § 3-6A-01 (e), property is not necessarily "acquired" on the date that a legal obligation to purchase is created. Thus, we effectuate our Act's purpose of "end[ing] the inequity inherent in Maryland's old 'title' system of dealing with the marital property of divorcing spouses." Report of The Governor's Comm'n on Domestic Relations Laws, at 1 (1982).

We also reject the Illinois transmutation of property theory. Although the Illinois Act is similar in many respects to the Maryland Act, we find nothing in the Maryland Act that indicates a legislative preference for the classification of property as marital. Under the statutory scheme embodied in the Maryland Act, the trial court must initially characterize all property owned by the parties, however titled, as either nonmarital or marital. § 3-6A-05 (a). Once characterized, the value of the marital property must be determined. Thereafter, the value of the nonmarital property of each spouse is assigned to that spouse and the value of the marital property is equitably distributed between the spouses. § 3-6A-05 (b). In making this equitable distribution, the trial court must consider nine relevant factors, including the monetary and nonmonetary contributions of each spouse, the value of the property interests of each spouse, and the effort expended by each spouse in accumulating the marital property. § 3-6A-05 (b).

Under the statutory scheme embodied in the Act, the nine relevant factors are to be considered only after the trial court has characterized the property of the parties as either nonmarital or marital. Thus, under the Maryland statutory scheme, a determination of what constitutes marital property is not dependent upon a consideration of the factors enumerated in § 3-6A-05 (b). Unlike the Illinois court, we are not persuaded that either the statutory scheme embodied in our Act or its express requirement that the trial court consider the monetary and nonmonetary contributions of each spouse, the value of the property interests of each spouse, and the effort expended by each spouse in accumulating the marital property indicates a legislative preference for the classification of property as marital.

Indeed, the language of § 3-6A-01 (e), which sets forth an exclusive list of nonmarital property, indicates a legislative intent that the value of certain property not be subject to equitable distribution, and that the interests of spouses making nonmonetary contributions be protected without depriving the other spouse of nonmarital property. To permit nonmarital property to be "transmuted" into marital property and, therefore, to be subject to equitable distribution deprives a spouse of nonmarital property and is, therefore, contrary to that legislative intent.

We conclude that under the Maryland Act the appropriate analysis to be applied is the source of funds theory. Under that theory, when property is acquired by an expenditure of both nonmarital and marital property, the property is characterized as part nonmarital and part marital. Thus, a spouse contributing nonmarital property is entitled to an interest in the property in the ratio of the nonmarital investment to the total nonmarital and marital investment in the property. The remaining property is characterized as marital property and its value is subject to equitable distribution. Thus, the spouse who contributed nonmarital funds, and the marital unit that contributed marital funds each receive a proportionate and fair return on their investment.

We recognize that in order to apply the source of funds theory in Maryland, it is necessary to adopt, as did the Supreme Judicial Court of Maine, an interpretation that defines the term "acquired," appearing in § 3-6A-01 (e), as the on-going process of making payment for property. *Tibbetts,* 406 A.2d at 77. Under this definition, characterization of property as nonmarital or marital depends upon the source of each contribution as payments are made, rather than the time at which legal or equitable title to or possession of the property is obtained.

The utilization of this definition of the term "acquired," coupled with the application of the source of funds theory, produces a result that comports with both the language and the purpose of the Maryland Act. Property directly attributable to the contribution of nonmarital property is characterized as nonmarital property and its value is not

subject to equitable distribution, a result that is consonant with § 3-6A-01 (e). Property directly attributable to contributions of marital property is characterized as marital property and its value is subject to equitable distribution, a result that is consonant with § 3-6A-01 (e) and § 3-6A-05 (a) and (b). Additionally, in making an equitable distribution of the value of all the property characterized as marital, nonmarital contributions to the marital property are to be considered, a result that is consonant with § 3-6A-05 (b) (1), (2), and (7). Because the definition of the term "acquired" and the application of the source of funds theory produces results consonant with the statutory scheme embodied in the Maryland Act, we believe it best effectuates the broad remedial purpose of the Act "to adjust the property interests of spouses fairly and equitably ... and to give careful consideration to both monetary and nonmonetary contributions by the spouses." *Bender,* 282 Md. at 535 n.7, 386 A.2d at 778 n.7.

Applying these principles to the instant case produces the following result. Ordinarily, under the three-step process provided by the Maryland Act, when real property is purchased and paid for in part before marriage and in part during marriage with nonmarital and marital funds, the property is nonmarital in part and marital in part. Additionally, ordinarily, when a marital residence is constructed upon that real property during marriage by the expenditure of nonmarital and marital property, the marital residence is nonmarital in part and marital in part.[7] The property and the marital residence are nonmarital in the ratio that the nonmarital investment in the property and the residence bears to the total nonmarital and marital investment in the property and the residence. To the extent that the property and the residence are nonmarital, their value is not subject to equitable distribution. Similarly, the property and the marital residence are marital in the ratio that the marital

---

7. We note that § 3-6A-05 (a) provides in pertinent part:

"Family use personal property or the family home shall not be considered marital property so long as it is the subject of a use and possession order."

investment in the property and the residence bears to the total nonmarital and marital investment in the property. To the extent that the property and the residence are marital, their value is subject to equitable distribution. When making an equitable distribution of the value of the marital property, the contributions, monetary and nonmonetary of each spouse, the value of the property interests of each spouse, and the effort expended by each spouse in accumulating the marital property, among other things, shall be considered.

In light of these newly adopted standards, this case must be remanded to the trial court to determine the source of the funds contributed to the real property and the marital residence by each of the spouses and the marital unit; to determine the extent to which the property and the marital residence are to be characterized as nonmarital or marital; to determine the value of the marital property; and to make an equitable distribution of the value of the marital property with due regard being given to all of the relevant factors.

> *Judgment of the Court of Special Appeals reversed in part.*
>
> *Case remanded to that Court with instructions to reverse in part the judgment of the Circuit Court for Anne Arundel County and to remand the case to that Court for further proceedings in accordance with this opinion.*
>
> *Costs to be equally divided.*